THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. STEVEN GASSMAN, Defendant-Appellant.

Second District   No. 2—91—1136

Opinion filed October 22, 1993.

Kenneth W. Torluemenke, Public Defender, of Wheaton (Stephen W. Baker and Ronald Fraley, Assistant Public Defenders, of counsel), for appellant.

James E. Ryan, State's Attorney, of Wheaton (William L. Browers and Lisa A. Hoffman, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Richard D. Frazier, of Metnick, Barewin, Wise & Cherry, of Springfield, for *amicus curiae*.

JUSTICE GEIGER delivered the opinion of the court:

The defendant, Steven Gassman, was charged with one count each of the unlawful possession of cannabis (Ill. Rev. Stat. 1989, ch. 56½, par. 704(c) (now 720 ILCS 550/4(c) (West 1992))); failure to dim headlights (Ill. Rev. Stat 1989, ch. 95½, par. 12—210(a) (now 625 ILCS 5/12—210(a) (West 1992))); unlawful transportation of open liquor (Ill. Rev. Stat. 1989, ch. 95½, par. 11—502(a) (now 625 ILCS 5/11—502(a) (West 1992))); driving while under the influence of drugs to a degree that rendered him incapable of safely driving (Ill. Rev. Stat. 1989, ch. 95½, par. 11—501(a)(3) (now codified, as amended, at 625 ILCS 5/11—501(a)(3) (West 1992))) (subsection 11—501(a)(3)); driving while under the combined influence of alcohol and drugs to a degree which rendered him incapable of safely driving (Ill. Rev. Stat. 1989, ch. 95½, par. 11—501(a)(4) (now codified, as amended, at 625 ILCS 5/11—501(a)(4) (West 1992))) (subsection 11—501(a)(4)); and driving with any amount of a drug in his blood or urine resulting from the unlawful use or consumption of cannabis or a controlled substance (Ill. Rev. Stat., 1990 Supp., ch. 95½, par. 11—501(a)(5) (now codified, as amended, at 625 ILCS 5/11—501(a)(5) (West 1992))) (subsection 11—501(a)(5)).

After a bench trial, the defendant was acquitted of violating subsections 11—501(a)(3) and 11—501(a)(4) but convicted of violating subsection 11—501(a)(5). The defendant was convicted of the remaining charges. The defendant received one year of court supervision and was ordered to pay a $300 fine for violating subsection 11—501(a)(5).

The defendant appeals only his conviction under subsection 11—501(a)(5). He argues that (1) this subsection and the corresponding charging document are constitutionally deficient because they fail to specify a requisite mental state as an element of the offense; (2) subsection 11—501(a)(5) violates due process because it is not a proper exercise of the police power; (3) subsection 11—501(a)(5) violates the Federal and State constitutional guarantees of equal protection; and (4) subsection 11—501(a)(5) is unconstitutionally vague.

We set out the relevant evidence from the trial. After the trial court denied the defendant's motion to dismiss the charge of violating subsection 11—501(a)(5), the case went to trial. The State's first witness was John Tannahill, a police officer for the Village of West-

mont. Officer Tannahill testified that, at about 11:10 p.m. on October 1, 1990, he was driving south on Cass Avenue when he observed a Cadillac about 500 to 600 feet away. The Cadillac had all four bright headlights on and was traveling at or slightly under the posted speed limit of 35 miles per hour. Tannahill noticed nothing unusual or suspicious about the way the car was driven other than the condition of the headlights. The officer flashed his bright lights, requesting the other driver to dim his lights. The two cars passed each other. Tannahill ordered the driver of the Cadillac to stop.

The Cadillac stopped. By the time Officer Tannahill approached the car, the driver, whom the officer identified in court as the defendant, had exited the car. The defendant was standing against the vehicle, but he was not holding onto anything for support, and he did not appear to be nervous. As Tannahill spoke to the defendant, the officer noticed that the defendant's breath smelled of alcohol. The defendant admitted that he had consumed three or four beers that evening.

After a search of the defendant's car turned up two cans of beer and a bag of a substance later identified as cannabis, Tannahill arrested defendant for possession of cannabis. Tannahill could not detect any odor of marijuana or any residue of marijuana cigarettes in the defendant's car. Tannahill noticed nothing unusual about the way the defendant walked to the squad car; the defendant did not stagger or sway. A pat-down search of the defendant at the scene revealed that the defendant had been carrying a small pipe in his pocket. Tannahill's experience led him to conclude that this was the type of pipe used to smoke cannabis and that there was some burned cannabis in the bowl of the pipe.

After Tannahill and the defendant arrived at the police station, Tannahill put the defendant through several field sobriety tests. The defendant performed poorly, although he was well short of "falling-down drunk." Tannahill placed the defendant under arrest for DUI. The defendant's breathalyzer test gave a reading of only .04, which the officer believed was not enough to put the defendant into the "condition he had."

After he arrested the defendant for DUI, Tannahill read the defendant his *Miranda* rights. The defendant signed a *Miranda* waiver form and answered some questions. Tannahill asked the defendant what the defendant had been doing in the past three hours. The defendant replied that he had drunk three or four beers and had had "a couple of hits" of cannabis. Tannahill's accident report stated that the defendant had admitted to having done "sev-

eral tokes" of cannabis earlier that evening. At Tannahill's instruction, the defendant underwent a blood and urine test at Hinsdale Hospital that evening.

The State's next witness was Dr. Jeffrey Benson, an Illinois State Police forensic scientist who performed the blood and urine test. Benson performed quantitative analyses on a blood sample, testing for the presence of phencyclidine (PCP) and cannabinoids, or substances which are indicative of the consumption of cannabis. The tests revealed a concentration of less than 10 micrograms per liter of PCP in the defendant's blood and less than 50 micrograms per liter of cannabinoids in the defendant's blood (a microgram is one-millionth of a gram). From these results, Dr. Benson concluded with a reasonable degree of scientific certainty that the defendant had consumed cannabis and PCP. However, he could not say when the defendant had used these substances. Dr. Benson testified that, in the case of habitual users, PCP and cannabinoids can be detected up to 30 days after drug use. The period is shorter for casual users.

Dr. Benson acknowledged that the measurements he made were imprecise in another respect. The instruments he used were not sensitive enough to give a precise reading of cannabinoid concentrations outside a range of 50 to 500 micrograms per liter or of PCP levels outside 10 to 50 micrograms per liter. Thus, Dr. Benson's estimates for the defendant's sample were extrapolations. Dr. Benson could say that the level of PCP in the defendant's blood sample was closer to one microgram per liter than to nine micrograms per liter. Dr. Benson estimated that the concentration of cannabinoids was 8 micrograms per liter, but he admitted that this figure was based on a calculation that could not provide scientific certainty.

Furthermore, Dr. Benson could not state firmly whether the concentrations of cannabinoids or PCP found in the defendant's blood were sufficient to cause any driving impairment. Although there is a general correlation between the level of cannabis use and impairment, Dr. Benson stressed that the relationship was not simple. He could not say with certainty either that the small amount of cannabinoids in the defendant's blood would impair driving or that such an amount would not impair driving. Of the substances known as cannabinoids, only THC is psychoactive. Also, the consensus among scientists is that there is no hard and fast relationship between the amount of PCP consumed and the seriousness of the drug's effects.

Dr. Benson acknowledged that a person could unknowingly ingest or inhale cannabinoids, such as by inhaling smoke from canna-

bis. Also, a person could consume PCP without realizing that he was doing so, a common way being through the smoking of a marijuana cigarette onto which PCP has been sprayed.

The defendant testified last. He stated that, on the night that Officer Tannahill stopped him, he had consumed two or three beers at about 8 p.m. while he was watching television with friends. At this gathering, he had also taken "one or two drags" from a joint. The defendant did not know that the cigarette had PCP on it, and he never knowingly used PCP.

The defendant conceded that he had told Officer Tannahill that he had drunk three or four beers between 8 and 11:30 p.m. on the evening that he was stopped. He smoked the marijuana "to get high" and because he did not feel like refusing the offer from his friends. He held the smoke in his lungs for a while before he blew it out. The marijuana he smoked was from friends and not from the bag that was discovered in his car.

The trial court acquitted defendant of violating subsection 11—501(a)(3) and of violating subsection 11—501(a)(4). The court convicted the defendant of the remaining charges, including violating subsection 11—501(a)(5); for this offense, defendant received one year of court supervision and was fined $300. After the court denied his motion to reconsider, defendant filed a late notice of appeal with leave from this court.

Defendant makes a variety of constitutional challenges to subsection 11—501(a)(5). For clarity, we set out the language of this subsection along with the others involved here:

> "§11—501. Driving while under the influence of alcohol, other drug, or combination thereof. (a) A person shall not drive or be in actual physical control of any vehicle within this State while:
>
> \*\*\*
>
> 2. under the influence of alcohol;
>
> 3. under the influence of any other drug or combination of drugs to a degree which renders such person incapable of safely driving;
>
> 4. under the combined influence of alcohol and any other drug or drugs to a degree which renders such person incapable of safely driving; or
>
> 5. there is any amount of a drug, substance or compound in such person's blood or urine resulting from the unlawful use or consumption of cannabis listed in the Cannabis Control

Act, or a controlled substance listed in the Illinois Controlled Substance Act.

(b) The fact that any person charged with violating this Section is or has been legally entitled to use alcohol, or other drugs, or any combination of both, shall not constitute a defense against any charge of violating this Section." Ill. Rev. Stat., 1990 Supp., ch. 95½, par. 11—501 (now codified, as amended, at 625 ILCS 5/11—501 (West 1992)).

Subsection 11—501(a)(5) was added by the passage of Public Act 86—1019, effective July 1, 1990. The remainder of the quoted material predates subsection 11—501(a)(5).

The defendant's first argument centers on whether the State needed to prove that the defendant intentionally violated subsection 11—501(a)(5) or whether the legislature created an absolute liability offense, *i.e.*, one where a conviction does not require proof of intent or another particular mental state. The defendant argues that, because the violation of subsection 11—501(a)(5) is a felony which may be punishable by incarceration, the failure of subsection 11—501(a)(5) to specify a mental state does not mean that a particular mental state is not an element of the offense. The defendant argues that we must construe section 11—501(a)(5) to include a requirement of intention or knowingness; thus, the defendant reasons, his conviction may not stand because (1) the State never alleged that the defendant *intentionally* drove while knowing that he had any amount of cannabis or another controlled substance in his system; and (2) the trial court did not find that defendant intentionally or knowingly engaged in the prohibited conduct.

The State makes two responses. First, the State argues that, because defendant admittedly smoked marijuana only a few hours before Officer Tannahill stopped him, it would make no difference whether subsection 11—501(a)(5) required a particular mental state. Thus, the State argues, the defendant lacks standing to challenge the statute on this basis because he is not within the class of those who would be aggrieved by the legislature's failure to include a requisite mental state.

Second, the State argues that subsection 11—501(a)(5) creates an absolute liability offense. The State maintains that subsection 11—501(a)(5), like its companion provisions in section 11—501 of the Illinois Vehicle Code, is a regulatory measure designed to protect the public from potentially unsafe drivers. The State analogizes this case to this court's decision in *People v. Teschner* (1979), 76 Ill. App. 3d 124, in which we held that driving while intoxicated (then

section 11—501(a) of the Illinois Vehicle Code) (Ill. Rev. Stat. 1977, ch. 95½, par. 11—501(a)) is an absolute liability offense.

■■ We hold first that the defendant has standing to raise the issue of whether we must read a particular mental state into the elements of a violation of subsection 11—501(a)(5). The State maintains that because the defendant admitted to having consumed cannabis some time before he was stopped, he has conceded that he had whatever culpable mental state subsection 11—501(a)(5) may require.

The State relies principally on *City of Chicago v. Lawrence* (1969), 42 Ill. 2d 461, *cert. denied* (1969), 396 U.S. 39, 24 L. Ed. 2d 208, 90 S. Ct. 263, in which the supreme court held that the defendants, who were convicted of interfering with a police officer, lacked standing to argue that the applicable statute was invalid because it lacked a *scienter* requirement. The court explained that as there was no question that the defendants acted intentionally, they were not prejudiced by any lack of a *scienter* requirement. *Lawrence*, 42 Ill. 2d at 464-65.

Here, however, the defendant correctly notes that the trial court, which concluded that subsection 11—501(a)(5) imposes strict liability, never made any finding as to the defendant's mental state at the time of the offense. Although the record *might* well support a finding that the defendant drove with knowledge that he had illegal substances still in his system, we decline to make this finding on our own. Conceivably, the defendant believed (if unreasonably) that the small amount of cannabis in his system had been dissipated in the interval between his consumption of the drug and his operation of the car.

Somewhat analogous to this case is *People v. Palmer* (1986), 141 Ill. App. 3d 234, in which the defendant appealed his conviction of aggravated arson. The defendant argued that the aggravated arson statute under which he was convicted was unconstitutional because it did not require a culpable mental state even though it created a Class X felony. The appellate court held that the defendant had standing to challenge the statute (which the court then invalidated), noting that the trial court had interpreted the statute as imposing strict liability and thus had made no finding as to whether the defendant acted with criminal intent. *Palmer*, 141 Ill. App. 3d at 238-39.

■ Having concluded that the defendant has standing to challenge subsection 11—501(a)(5), we inquire next whether that provision creates a strict liability offense. We agree with the State that

subsection 11—501(a)(5) imposes strict liability and that, as a result, the charge was not defective.

The defendant places his primary reliance on the following provision of the Criminal Code of 1961:

"§4—9. Absolute Liability. A person may be guilty of an offense without having, as to each element thereof, one of the mental states described in Sections 4—4 through 4—7 if the offense is a misdemeanor which is not punishable by incarceration or by a fine exceeding $500, *or the statute defining the offense clearly indicates a legislative purpose to impose absolute liability for the conduct described.*" (Emphasis added.) Ill. Rev. Stat. 1991, ch. 38, par. 4—9 (now 720 ILCS 5/4—9 (West 1992)).

The defendant observes that a violation of subsection 11—501(a)(5) is at minimum a Class A misdemeanor and may, under certain circumstances, be a Class 4 felony (see Ill. Rev. Stat. 1991, ch. 95½, pars. 11—501(c), (d) (now 625 ILCS 5/11—501(c), (d) (West 1992))); therefore, such a violation may result in the imposition of a penalty more severe than a $500 fine (see Ill. Rev. Stat. 1991, ch. 38, pars. 1005—1—14, 1005—8—1(a)(7) (now 730 ILCS 5/5—1—14, 5/5—8—1(a)(7) (West 1992))). The defendant concludes that subsection 11—501(a)(5) may impose absolute liability only if there is a clear legislative intent to do so. Relying on both the language of subsection 11—501(a)(5) and its legislative history, the defendant maintains that there is insufficient proof of such a legislative intent.

We agree with the State that subsection 11—501(a)(5), like the other four provisions of subsection 11—501(a), is a traffic regulation for which the legislature intended absolute liability. To explain our conclusion, we begin with basic principles of statutory construction. Our fundamental task in construing the statute is to ascertain and effectuate the intent of the legislature. (*People v. Bole* (1993), 155 Ill. 2d 188, 195.) Our inquiry begins with the statutory language itself, which is usually the best indication of the legislature's intent. (*Bole*, 155 Ill. 2d at 195; *Collins v. Board of Trustees of the Firemen's Annuity & Benefit Fund* (1993), 155 Ill. 2d 103, 111.) In reading the statute as a whole (see *Collins*, 155 Ill. 2d at 111), we consider the reason for the law, the evils it was intended to remedy, and the objects it was designed to attain. *Bole*, 155 Ill. 2d at 195; *Collins*, 155 Ill. 2d at 111.

Both at the trial level and in this court, the defendant has introduced evidence of the challenged law's history, including statements by its sponsors as to the purpose of subsection 11—501(a)(5). We

need not decide to what degree we ought look past the language of the statute and consider its legislative history; we have reviewed the legislative history the defendant has supplied, and we find that it is together consistent with the interpretation of subsection 11—501(a)(5) that we have derived from the statute itself without direct reference to legislative history.

The defendant observes that subsection 11—501(a)(5) does not explicitly state that it creates an absolute liability offense. We do not believe that this consideration is dispositive. As the State points out, the subsection imposes liability without specifying a particular mental state, and this purposeful omission itself militates in favor of a finding that the legislature did not intend that a culpable mental state be an element of a violation of subsection 11—501(a)(5).

Of course, this consideration is not by itself conclusive, as the absence of a specified mental state does not mean that one ought not be read in, particularly where the possible punishment is substantial. (Ill. Rev. Stat. 1991, ch. 38, par. 4—9 (now 720 ILCS 5/4—9 (West 1992))); *Morissette v. United States* (1952), 342 U.S. 246, 263, 96 L. Ed. 288, 300, 72 S. Ct. 240, 250; *People v. Gean* (1991), 143 Ill. 2d 281.) Crucial to our consideration is that subsection 11—501(a)(5) is one of a set of traffic regulations that are all intended to protect the public against motorists who drive under the influence of substances that may impair safe driving. Because subsection 11—501(a)(5) addresses the same subject matter as the other provisions of subsection 11—501(a), we read all these provisions *in pari materia*. (See *Stone v. Department of Employment Security Board of Review* (1992), 151 Ill. 2d 257, 262.) We conclude that the legislature intended subsection 11—501(a)(5) to operate in the same manner as subsections 11—501(a)(1) through 11—501(a)(4): as a strict liability provision.

In *People v. Teschner* (1979), 76 Ill. App. 3d 124, the defendant appealed his conviction of violating subsection 11—501(a) of the Illinois Vehicle Code, which at that time provided that "[n]o person who is under the influence of intoxicating liquor may drive or be in actual physical control of any vehicle within this State." (Ill. Rev. Stat. 1977, ch. 95½, par. 11—501(a).) The defendant contended that because subsection 11—501(a) was punishable by imprisonment, he could not be convicted of the offense unless the State alleged and proved that he had acted with a particular requisite mental state.

In rejecting this contention and thereby holding that subsection 11—501(a) created an absolute liability offense, this court emphasized that the statute came under the "general rule" that "for mo-

tor vehicle offenses a defendant's intent, knowledge, or motive is immaterial to the question of guilt. The only intention necessary for liability *** is the doing of the act prohibited." (*Teschner*, 76 Ill. App. 3d at 125.) This court stressed that laws such as subsection 11–501(a) are intended to ensure the proper regulation of traffic and traffic accidents and that this broad regulatory goal requires absolute liability. The court observed that, unlike criminal statutes where criminal intent is a necessary element, the Vehicle Code is "regulatory, as opposed to penal." *Teschner*, 76 Ill. App. 3d at 126.

This reasoning is applicable to subsection 11–501(a)(5) of the present Vehicle Code. As the legislative history that the defendant supplies makes evident (and as we would conclude even absent such legislative history), the legislature's intent in passing subsection 11–501(a)(5) was to protect the public against the danger of those who drive while under the influence of cannabis or other illegal drugs.

Although subsections 11–501(a)(3) and 11–501(a)(4) already make it unlawful to drive while under the influence of illegal drugs, the legislature may well have concluded that a more sweeping prohibition against driving with drugs in one's system was necessary because of the difficulty of ascertaining whether drug use has in fact impaired the driver's ability. Indeed, the legislative history that the defendant cites makes it evident that such was the reasoning of the legislation's sponsors. The senator who sponsored the legislation stated that it was designed "to curb the incidence of drug [*sic*] driving, as we have drunk driving." (86th Ill. Gen. Assem., Senate Proceedings, May 25, 1989, at 21 (statements of Senator Barkhausen).) The flat prohibition against driving with any amount of a controlled substance in one's system was considered necessary because "there is no standard that one can come up with by which, unlike alcohol in the bloodstream, one can determine whether one is—is driving under the influence." 86th Ill. Gen. Assem., Senate Proceedings, May 25, 1989, at 23 (statements of Senator Barkhausen).

The defendant argues that construing section 11–501(a)(5) as a strict liability offense would unjustly create criminal liability for those who ingested controlled substances inadvertently or unknowingly. We disagree. A straightforward reading of section 11–501(a)(5) demonstrates that it imposes liability only on those motorists who have controlled substances in their systems as the result of the *unlawful* use of those substances. Also, the defendant admitted that he intentionally ingested cannabis. Thus, even were this particular argument valid, the defendant would lack standing to raise it.

■ Next, we reject the defendant's assertion that section 11—501(a)(5) is unconstitutionally vague. A statute is void for vagueness only if it fails to give people of ordinary intelligence a reasonable opportunity to know what conduct is lawful and what conduct is prohibited. (*People v. Bales* (1985), 108 Ill. 2d 182, 188.) Subsection 11—501(a)(5) plainly prohibits individuals from driving with *any* amount of a controlled substance unlawfully in their systems. Thus, like the language of subsection 11—501(a)(1), which prohibits motorists from driving with a blood-alcohol content of .10 or more, "the terms [of subsection 11—501(a)(5)] defining the offense in conduct [*sic*] could not be more precise." *People v. Kappas* (1983), 120 Ill. App. 3d 123, 131, approving *People v. Galante* (1983), 143 Cal. App. 3d 709, 192 Cal. Rptr. 184.

Additionally, subsection 11—501(a)(5) punishes only those who have already knowingly ingested illegal substances. Thus, the defendant scarcely may argue that the statute at issue blurs the line between prohibited and lawful conduct; a conviction of violating subsection 11—501(a)(5) presupposes that the defendant has violated laws that this defendant does not even argue are invalid.

■ We move next to the defendant's assertion that subsection 11—501(a)(5) violates equal protection (see U.S. Const., amend. XIV; Ill. Const. 1970, art. I). The defendant argues that the law arbitrarily distinguishes between two similarly situated groups of motorists: (1) those who drive after having unlawfully ingested any amount of a controlled substance; and (2) those who drive after having inadvertently or innocently ingested any amount of a controlled substance. The defendant notes that only drivers in the former class may be convicted even though drivers in the latter class are as likely to be impaired as a result of having controlled substances in their systems. Thus, the defendant reasons, the law unreasonably distinguishes between these "similarly situated" sets of drivers.

As subsection 11—501(a)(5) burdens no fundamental right and implicates no suspect classification, it does not violate equal protection as long as it bears a rational relation to a legitimate State interest. (*People v. Shephard* (1992), 152 Ill. 2d 489, 499-500.) Moreover, as no fundamental right is at stake, the legislature may distinguish between similarly situated groups if there is a rational basis to do so. *People v. Esposito* (1988), 121 Ill. 2d 491, 501.

Initially, we reject the defendant's assertion that the two groups to which he refers are "similarly situated." In fact, a motorist in the first group has violated the laws prohibiting certain drugs, while a driver in the second group has not intentionally consumed

illicit substances. Moreover, we may take notice that one who deliberately uses controlled substances ordinarily does so with the intention of altering his state of consciousness in ways that are likely to interfere with safe driving. The same cannot be said of those who inadvertently absorb illicit substances, especially as a person who does not intend to do so is not likely to absorb a drug in as great an amount as one who deliberately uses the drug to produce a "high."

Assuming *arguendo* that these two types of motorists are similarly situated, subsection 11—501(a)(5)'s classification is valid anyway. The legislature may have rationally concluded that only drivers who have deliberately absorbed illegal drugs into their systems deserve subsection 11—501(a)(5)'s penalties because they present a more pervasive and severe problem to society than the occasional driver who has inadvertently consumed a controlled substance. Furthermore, the legislature may have concluded that those who do not intentionally violate the drug laws are less deserving of punishment than those who do; thus, the legislature reasonably could have decided not to punish the former group absent specific evidence that the inadvertent consumption impaired their ability to drive safely.

■ Finally, we reject the defendant's argument that subsection 11—501(a)(5) violates due process. As is true of equal protection, the requirements of substantive due process are satisfied as long as the statute bears a reasonable relation to the public interest that the law has been enacted to serve. *Boynton v. Kusper* (1986), 112 Ill. 2d 356, 367.

The defendant concedes that the State has a legitimate interest in protecting the public from drivers whose driving ability may be impaired by the consumption of controlled substances. However, the defendant notes that subsections 11—501(a)(3) and 11—501(a)(4) already prohibit people from driving while they are impaired by illegal drugs. Thus, he reasons, the extra prohibition of subsection 11—501(a)(5) serves no added purpose and does not contribute to the legitimate goal of keeping impaired drivers off the roads.

The legislative history the defendant has provided us supplies the refutation to the argument that he now makes. As we have noted, proponents of the bill that became subsection 11—501(a)(5) were concerned that there is no simple or clear standard to apply to determine whether an individual is driving under the influence of one or more of the many illegal drugs to which subsection 11—501(a)(5) applies. The legislature may have concluded with reason that the sweeping language of subsection 11—501(a)(5) increased

the power of law enforcement officials to deter "drugged driving" beyond what deterrent power had been provided by subsections 11—501(a)(3) and 11—501(a)(4).

As the defendant has failed to persuade us that subsection 11—501(a)(5) is unconstitutional, we affirm his conviction of violating that provision. As the defendant does not raise any other issues on appeal, the entire judgment of the circuit court of Du Page County is affirmed.

Affirmed.

UNVERZAGT and QUETSCH, JJ., concur.