[Cite as *State v. Duncan*, 2025-Ohio-1153.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-240190 |
| | | TRIAL NO. C/22/TRC/28666 |
| Plaintiff-Appellee, | : | |
| vs. | : | |
| | | *O P I N I O N* |
| CURTIS DUNCAN, | : | |
| Defendant-Appellant. | : | |

Criminal Appeal From: Hamilton County Municipal Court

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: March 31, 2025

*Connie M. Pillich*, Hamilton County Prosecuting Attorney, and *Sean Donovan*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Raymond T. Faller*, Hamilton County Public Defender, and *Lora Peters*, Assistant Public Defender, for Defendant-Appellant.

ZAYAS, **Judge.**

**{¶1}** After entering a no-contest plea, Curtis Duncan was found guilty of operating a motor vehicle ("OVI") with a prohibited concentration of marihuana[1] metabolite in his urine, in violation of R.C. 4511.19(A)(1)(j). In two assignments of error, Duncan argues that the trial court erred in overruling his motion to suppress because his arrest was not supported by probable cause, and that the court erred in overruling his motion to dismiss the charge because the marihuana-metabolite statute violated his equal-protection rights. For the following reasons, we affirm the judgment of the trial court.

## Factual Background

**{¶2}** After encountering a sobriety checkpoint, Duncan was charged with driving impaired in violation of R.C. 4511.19(A)(1)(a) in the case numbered C/22/TRC/19194. The traffic citation noted that the charge was based on a urine screen. Duncan filed a motion to suppress challenging whether there was probable cause to arrest him and whether the field sobriety tests were conducted in substantial compliance with the National Highway Traffic Safety Administration ("NHTSA") standards.

**{¶3}** A trooper, who worked for the Ohio State Highway Patrol, was assigned to an OVI checkpoint in Cheviot when he encountered Duncan. When the trooper spoke with Duncan, he noted an odor of alcohol on his breath. Duncan admitted that he was coming from a celebration where he consumed a small amount of wine. The trooper observed that Duncan was somewhat disoriented and had an abnormal speech pattern with delayed responses and the interjection of irrelevant information. Based

---

[1] The statute spells marihuana with an "h," but the briefs and some of the cases spell it with a "j."

on these observations, the trooper asked Duncan to perform standardized field sobriety tests ("SFST") to either confirm or refute his suspicion that Duncan was impaired.

{¶4} The trooper was trained in conducting SFSTs at the Ohio State Highway Patrol Academy in November of 2021. After a 40-hour training, the trooper received his certificate for completing the training. The trooper administered the horizontal gaze nystagmus ("HGN") test first and testified that he completed the pre-medical checklist for all of the tests before conducting the HGN to ensure Duncan had no head injury or medical issues that could potentially cause adverse effects on the SFSTs.

{¶5} The trooper used the tip of a pen as the stimulus and testified to the steps he took in conducting the test. The trooper detected a lack of smooth pursuit in both eyes and nystagmus at maximum deviation in both eyes, for a total of four out of six clues. The trooper did not see the presence of nystagmus prior to a 45-degree angle. The trooper testified that nystagmus can be caused by alcohol or several different drug categories.

{¶6} While the trooper was conducting the HGN, Duncan told him that the stadium lights were bothering his eyes. The trooper instructed Duncan to face away from the lights and conducted the test. The trooper acknowledged that the NHTSA manual instructs that a subject should not be facing flashing or strobe lights during the test because a subject's eyes may move toward the lights, producing an effect similar to nystagmus. The trooper testified that the stadium lights were not flashing or strobe lights.

{¶7} Next, the trooper administered the walk-and-turn ("WAT") test on a blacktop-paved parking lot. After the trooper demonstrated the test, provided the test instructions to Duncan, and confirmed Duncan understood the instructions, he had

Duncan perform the test. Duncan moved his feet or lost his balance while in the starting position, did not step heel to toe, and started the test before instructed to do so, for a total of three out of eight clues. The test could not be completed because Duncan was unable to follow the instructions. After taking the required nine steps, Duncan did not turn and take nine steps back, and instead continued to walk. The trooper also testified that Duncan broke his starting position during the HGN and WAT tests, and that he had to be reminded to track the stimulus on the HGN test. The trooper administered the one-leg-stand ("OLS") test and observed one out of four clues. Duncan put his foot down to maintain his balance during the test.

{¶8} Based on his training, experience, and observations, and Duncan's admission of consuming alcohol, general disorientation, and inability to follow simple instructions, the trooper arrested him for driving while under the influence. The trooper opined that Duncan was appreciably impaired.

{¶9} The trooper transported Duncan to the Cheviot Police Department. Duncan submitted a urine sample that showed a level of marihuana metabolites over the legal limit.

{¶10} Duncan argued that the trooper had no probable cause to arrest him because the trooper did not observe any impaired driving or slurred speech and driving after consuming one drink is not illegal. With respect to the HGN test, Duncan argued the test was not conducted in substantial compliance because he was facing stadium lights, and restarting the test could cause eye fatigue. Duncan did not challenge the administration of the WAT and OLS tests.

{¶11} After taking judicial notice of the NHTSA standards, the trial court found that the trooper was NHTSA certified to conduct the testing, and he administered all of the SFSTs in substantial compliance with NHTSA standards. The

4

court further found that the trooper had probable cause to arrest Duncan after detecting an odor of alcohol on his breath, along with Duncan's admission of consumption, his delayed speech patterns and disorientation, his inability to follow simple instructions, and his performance of the SFSTs.

{¶12} After the motion was denied, a new citation was issued, charging Duncan with a violation of R.C. 4511.19(A)(1)(j) in the case numbered C/22/TRC/28666. The state dismissed the initial charge and proceeded solely on the impairment charge based on marihuana. Duncan notified the court that he would be seeking to dismiss the charge, and the case was continued for a hearing on the motion to dismiss.

{¶13} Duncan sought to dismiss the charge alleging that the "per se marihuana metabolite provision discriminates against unimpaired drivers whose blood or urine contains the marihuana metabolite 11-nor carboxy-tetrahydrocannabinol ("THCA")."

{¶14} Before the hearing started, Duncan requested "the record from C/22/TRC/19194 to be adopted into the record of this case number." Duncan explained that, "[w]e would like the appellate court to be able to consider that motion." The prosecutor had no objection and responded, "This is obviously two different case numbers arising out of the same incident. It's no different than if there were an A and a B charge and the A was dismissed. I think it's appropriate that all the previous testimony in the record be incorporated into this case." The trial court incorporated the record of C/22/TRC/19194 into the present case and proceeded with the hearing on the motion to dismiss.

{¶15} An expert in clinical toxicology, clinical pharmacology, pharmacokinetics, and psychopharmacology testified that THC is the chemical in a marihuana plant that causes impairment, and THCA is a metabolite of THC that is an

inactive chemical that does not cause impairment. The liver produces THCA from THC. When a urine screen does not detect THC, there is no evidence of impairment. The expert further opined that a THCA urine level of 11 is a trivial level.

**{¶16}** When marihuana is smoked, it is absorbed into the blood and some is absorbed by fat, some goes to the brain causing impairment, and some is metabolized and eliminated through urine. This process in a chronic user can take days or months, and the THCA can remain in the urine for up to 90 days after ingesting marihuana. Habitual users have a large fat store of THC that is slowly leaked over time. The leaked THC goes to the liver and is metabolized to THCA. Dehydration can cause a higher level of THCA because there is less urine in the bladder. The presence of THCA does not prove recent marihuana consumption or intoxication. The expert testified to a reasonable degree of scientific certainty that there is no proof that Duncan was intoxicated that night.

**{¶17}** On cross-examination, the expert agreed that the speed at which THC is metabolized varies from person to person. Metabolism is slower if the liver is not healthy, and the older a person is, the slower the liver will process it. Large individuals must consume more THC to feel the effects of intoxication. If the urine volume is low, the THCA level will be higher than if the urine volume were higher. THCA in urine does not prove recent use or intoxication, but it could be attributed to recent use.

**{¶18}** Duncan argued that the marihuana-metabolite provision violated the Equal Protection Clause as the presence of the metabolite does not indicate impairment. He further argued that the law does not equally protect all drivers from being falsely convicted of driving impaired because the per se limit based on a THCA level is arbitrary and irrational and does not serve a legitimate governmental purpose.

**{¶19}** The trial court overruled the motion after finding that Duncan did not

establish a suspect class or fundamental right at stake, the State had a rational basis in eliminating drivers impaired by marihuana, and that the statute comports with the public policy of reducing the number of people who drive under the influence of marihuana. Relying on *State v. Doane*, 2020-Ohio-900 (5th Dist.), the court found that the statute was reasonably related to the implementation of a legitimate governmental interest.

## Motion to Suppress

**{¶20}** In his first assignment of error, Duncan contends that the trial court erred in overruling his motion to suppress because the arrest was not supported by probable cause and the SFSTs were not conducted in substantial compliance with the NHTSA manual.

**{¶21}** The State argues that this issue was not preserved for appellate review in this case because the entry did not specify that the trial court adopted its previous findings and decision to overrule the motion to suppress. Absent a second entry, the State contends, there is no final order, divesting this court of jurisdiction. The State cited no authority to support this proposition, and we could find none.

**{¶22}** The court incorporated the entire record of C/22/TRC/19194, which included the entry denying the motion, the transcript of the proceedings, and the motion to suppress filed by Duncan. The State agreed with Duncan's request and pointed out that the scenario was no different than a case with an A and a B charge, where one charge has been dismissed. As the State acknowledged in its brief, the purpose of incorporating the record was to preserve the denial of the motion to suppress for appellate purposes. By agreeing to Duncan's request, the State waived any objection on appeal. *See State v. Childs*, 14 Ohio St.2d 56 (1968), paragraph three of the syllabus.

**{¶23}** Appellate review of a motion to suppress presents a mixed question of law and fact. *State v. Burnside*, 2003-Ohio-5372, ¶ 8. When ruling on a motion to suppress, this court must defer to the trial court's factual findings if competent, credible evidence exists to support those findings. *See id.* "Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard." *Id.*

**{¶24}** The standard for determining whether an officer had probable cause to arrest a suspect for OVI is whether the facts and circumstances within the police officer's knowledge are sufficient to cause a reasonably prudent person to believe that the defendant was driving under the influence. *See State v. Ruberg*, 2013-Ohio-4144, ¶ 11 (1st Dist.); *State v. Homan*, 89 Ohio St.3d 421, 427 (2000). In making this determination, an appellate court examines the totality of facts and circumstances surrounding the arrest. *Homan* at 427.

**{¶25}** In this case, the trial court found that the trooper had probable cause to arrest Duncan for driving impaired based upon the following facts and circumstances: (1) an odor of alcohol on Duncan's breath; (2) Duncan's admission of consumption; (3) Duncan's delayed speech patterns and disorientation; (4) Duncan's inability to follow simple instructions; and (4) the trooper's observations of Duncan's performance and results of the SFSTs.

**{¶26}** Under the totality of the circumstances we cannot conclude that the trial court erred in finding that the trooper had probable cause to believe that Duncan was operating a vehicle under the influence. These facts and circumstances, when considered as a whole, would have justified an objectively reasonable officer in believing that Duncan had been driving impaired. Thus, there was sufficient evidence

to establish probable cause to arrest.

{¶27} Duncan argues that this court should disregard the SFSTs because the tests were not administered in substantial compliance with NHTSA standards. When the SFST's are excluded, Duncan contends that the trooper lacked probable cause to arrest Duncan. However, the court found that the trooper conducted the SFSTs in substantial compliance with NHTSA. Significantly, Duncan did not challenge the court's factual findings or legal conclusions on appeal with respect to the court's determination that the SFSTs were conducted in substantial compliance with NHTSA. Moreover, Duncan appears to concede that the trooper had probable cause to arrest Duncan when the SFSTs are considered.

{¶28} Accordingly, we overrule Duncan's first assignment of error.

### Motion to Dismiss

{¶29} Next, Duncan argues that R.C. 4511.19(A)(1)(j)(viii)(II) violated his right to equal protection as the testing of the marihuana metabolite THCA, an inactive chemical, does not indicate impairment. We review the trial court's denial of a motion to dismiss de novo. *See State v. Campbell*, 2013-Ohio-5612, ¶ 3 (1st Dist.).

{¶30} The Equal Protection Clauses of both the United States and Ohio Constitutions provide that all persons are entitled to the equal benefit of the laws. *McCrone v. Bank One Corp.*, 2005-Ohio-6505, ¶ 6. The limitations placed upon governmental action by the state and federal government are essentially the same. *Ohio Apt. Assn. v. Levin*, 2010-Ohio-4414, ¶ 33. "Equal protection does not forbid the legislature from making classifications but simply prohibits 'treating differently persons who are in all relevant respects alike.'" *State v. Klembus*, 2016-Ohio-1092, ¶ 8. Both clauses require all similarly-situated individuals be treated in a similar manner. *McCrone* at ¶ 6.

9

**{¶31}** Statutes are presumed constitutional. *State v. Anderson*, 57 Ohio St.3d 168, 171 (1991). Government actions that affect suspect classifications or fundamental interests are subject to strict scrutiny by the courts. *Eppley v. Tri-Valley Local School Dist. Bd. of Edn.*, 2009-Ohio-1970, ¶ 14. In the absence of a suspect classification or fundamental interest, the state action is subject to a rational-basis test. *Id.*

**{¶32}** Under the rational-basis test, a statute will be upheld if it bears a rational relationship to a legitimate governmental interest. *State v. Topolsky*, 2015-Ohio-4963, ¶ 30 (10th Dist.). "The rational-basis test involves a two-step analysis. We must first identify a valid state interest. Second, we must determine whether the method or means by which the state has chosen to advance that interest is rational." *Pickaway Cty. Skilled Gaming, L.L.C. v. Cordray*, 2010-Ohio-4908, ¶ 19, quoting *McCrone* at ¶ 9.

**{¶33}** Duncan acknowledges that the rational-basis standard of review applies, and that the State has a legitimate interest in highway safety and keeping impaired drivers off the road. Duncan argues that the statute violates equal protection because "the testing of the marijuana metabolite THCA, an inactive chemical, does not indicate impairment."

**{¶34}** In conducting any equal-protection analysis, the first step is to examine the classifications created by the statute in question. *State v. Schultz*, 2015-Ohio-2252, ¶ 12 (12th Dist.), citing *Burnett v. Motorists Mut. Ins. Co.*, 2008-Ohio-2751, ¶ 31. "[W]here there is no classification, there is no discrimination which would offend the Equal Protection Clause." *Burnett* at ¶ 31. Duncan contends the statute impermissibly discriminates against drivers who have consumed marihuana, present with metabolites in their urine, but are not actually impaired. But, as the Twelfth District determined, "it is readily apparent from the language of the statute, its

legislative history, and its practical application that the statute aims to distinguish between unimpaired motorists and motorists who are under the influence of marijuana." *Schultz* at ¶ 15.

**{¶35}** Like Duncan, Schultz provided scientific evidence that "past marijuana use could possibly result in a driver having 35 nanograms of marijuana metabolites per milliliter of his or her urine, yet the driver would not be functionally impaired." *Id.* at fn. 1. As the *Schulz* court concluded, "the evidence does not, however, demonstrate that there is no rational connection between the statutory marijuana metabolites standard and impairment. We are mindful that '[o]ur equal protection review does not require us to conclude that the state has chosen the best means of serving a legitimate interest, only that it has chosen a rational one.'" *Id.*, quoting *Fabrey v. McDonald Village Police Dept.*, 70 Ohio St.3d 351, 354 (1994). The court concluded that, "Differences in treatment based on the use of marijuana before operating a motor vehicle does not impinge upon a fundamental right or burden a suspect class." *Id.* at 17. Ultimately, the court held that "the rational basis standard unquestionably supports the General Assembly's endeavor to maintain safety on public roadways by providing a mechanism by which to prosecute individuals who operate a motor vehicle while under the influence of marijuana." *Id.*

**{¶36}** In reaching this conclusion, the court relied on this court's analysis in *State v. Whalen*, 2013-Ohio-1861 (1st Dist.). In *Whalen*, both the State and Whalen provided expert testimony regarding the rapid dissipation of THC and the science underlying the testing of the marihuana metabolite THCA. *Id.* at ¶ 5. Whalen challenged the statute as vague and overbroad, although "his real quibble seems to be with the legislative decision to criminalize driving based upon the presence of a marihuana metabolite that may not itself cause impairment." *Id.* at 16. This court

explained:

> [U]nlike some other states, Ohio does not prohibit driving with any amount of a marihuana metabolite in one's body but rather sets certain maximum limits that may not be exceeded. *Compare People v. Gassman*, 251 Ill.App.3d 681, 622 N.E.2d 845, 190 Ill. Dec. 815 (1993); *State v. Phillips*, 178 Ariz 368, 873 P.2d 706 (1994). The General Assembly, in constructing the per se statute, expressly considered the arguments of those who claimed that the law lacked a direct correlation between the prohibited amount of marihuana and its metabolite in a driver's system and impairment. Senators Steve Austria and Patricia Clancy, two of the bill's sponsors, noted during deliberations on the bill that they had worked closely with forensic toxicologists to establish the precise levels at which driving is prohibited in the statute and that the levels in the bill were not only consistent with federal standards, but that the forensic toxicologists who had participated in setting those levels had unanimously agreed that anyone driving with the levels of the substance listed in the bill definitely would be impaired. *See* 2005 OH Sub.S.B. 8, Third Consideration, available at http://www.ohiochannel.org Ohio Senate Session (February 16, 2005) 14:15:57 (accessed May 1, 2013).

*Id.* at ¶ 16, fn. 2.

**{¶37}** The court further noted that driving is a privilege, not a right, and Whalen had no constitutional right to drive while under the influence. *Id.* at 17, 15. Because the State has a legitimate interest in prohibiting impaired driving, "the General Assembly acted well within its police powers in criminalizing driving with a

prohibited amount of marihuana or marihuana metabolite in a person's blood or urine." *Id.* at ¶ 17.

**{¶38}** Moreover, every appellate court that has considered this marijuana-metabolite argument has held that R.C. 4511.19(A)(1)(j)(viii)(II) is constitutional. *See, e.g., State v. Naylor*, 2024-Ohio-1648, ¶ 85, 90 (11th Dist.) ("We agree with our sister districts and conclude R.C. 4511.19(A)(1)(j)(viii)(II) is not void for vagueness. We agree with the *Whalen* court and conclude R.C. 4511.19(A)(1)(j)(viii)(II) does not violate substantive due process."); *State v. Doane*, 2020-Ohio-900, ¶ 25 (5th Dist.) ("For the foregoing reasons, we agree with those district courts of appeal which have found that the marijuana metabolite per se statute is not unconstitutional on equal protection or due process grounds."); *Topolosky*, 2015-Ohio-4963 at ¶ 39 (10th Dist.) (Because we find that R.C. 4511.19(A)(1)(j)(viii)(II) is not void for vagueness and does not violate constitutional guarantees of equal protection and due process, we overrule Topolosky's fourth assignment of error.").

**{¶39}** Following our precedent in *Whalen* and our sister courts, we overrule the second assignment of error.

## Conclusion

**{¶40}** Having overruled Duncan's two assignments of error, we affirm the judgment of the trial court.

Judgment affirmed.

**KINSLEY, P.J.,** and **BOCK, J.,** concur.

Please note:

The court has recorded its entry on the date of the release of this opinion.